Good morning. The last case on the counter is Thomas Ireland v. Bill Prummell, Corizon LLC, Tabitha Carter. Mr. Cook is here for Mr. Ireland, and Mr. Toomey is here for Hebner and Corizon, and Ms. Barranco is here for the remaining Applees. Ms. Barranco, it looks like you are taking the bulk of the argument. Good morning. Yes, Your Honor. Ten minutes. Ten minutes. Okay. And Mr. Toomey, you'll take five minutes? Yes, ma'am. All right. Perfect. Mr. Cook, would you like to say five minutes for rebuttal? Yes, Your Honor. All right. Are you ready to proceed? I am, Your Honor. All right. You may proceed. Thank you. Thank you. And may it please the court, I'm James Cook for the plaintiff in this matter, Thomas Flynn. The events that we're here on today that ended in the death of Greg Ireland began at 2.5 on Saturday morning when he was arrested for driving under the influence. He was subject to a DUI protocol because his breath test revealed a .314 over a .3 blood alcohol level. And so he was, according to the protocol, taken to the hospital that was Charlotte Regional Medical Center, and he was examined by Dr. James McMullen, the ER doctor. He was given a prescription for potassium chloride to deal with a community had hypokalemia, which is low potassium. And also discharge instructions also required that he see a doctor for follow up. What actually happened is that when he left the hospital and went back to the jail in several respects, the protocol, the DUI protocol, which was a protocol between the jail and the hospital, was not followed in that Mr. Ireland never got his medication. He was supposed to have gotten two doses of medication before the doctor who did not examine him. It was not on site, was contacted remotely, countermanded the OR for potassium and failed to order the Valium, which was another part of the DUI treatment. And so he ultimately ended up with no potassium after the one dose that he was given at the hospital. And our expert says that withdrawal is something that typically occurs then at least by well by 48 hours or more. And so late the night of Sunday, after having received no medication, he begins to shout what one officer, Shwoko, said was weird and obnoxious statements out onto the wing. So that between 11 and 3 a.m. the next morning, he had to be reprimanded in order to not to wake up the other inmates. Nevertheless, and I think it's important to note, and I have filed in the record stills from the video, that Mr. It would have been something, of course, that Mr. Shwoko was aware of. Mr. Swartz and Truber, who was also assigned to the wing, would have been aware of when at 3 a.m. there was a dispute between Mr. Ireland and his cellmate, claiming that Mr. Ireland splashed water on him. Officer Swartz and Truber goes up to the cell and the roommate is asking to be moved. So he lets the roommate out of the cell and the cellmate goes down to the common area of the cell block. And officer decides that he's going to retrieve something called a boat. It's a bed that lays on the floor that they use whenever they have two detox patients in the same cell so that nobody has to occupy the top bunk. So at that point, Mr. Ireland has been very congenial. He was noted as smiling at the door. He had been chatting about football shortly before that time. And when officer Swartz and Truber tries to move the boat, he says, let me help you. Officer Swartz and Truber tells him to sit down. He helps to move the boat forward toward the door. He takes a step forward and officer Swartz and Truber deploys his taser, striking Mr. Ireland. And he is subject to a five second shock. Immediately afterwards, officer Swartz and Truber calls backup. And so when officers Swoco and Wiles get to the cell, Mr. Ireland is rolling around on the boat and Can I ask you a question, Mr. Cook? Yes, your honor. With regard to the deliberate indifference claim as against the doctor, seems to me that's really at the heart of this case. There are other issues and claims. I don't mean to understate them, but it seems at least to me that the conduct of Dr. Gonzalez in ordering a blood test before prescribing the potassium is at the heart of this lawsuit. Your expert characterizes Dr. Gonzalez choice to schedule the testing as being, quote, inappropriate. And he says, interpret your expert explained that the potassium level had already been determined that the hospital, there was no indication for her to recheck that had already been determined by a hospital doctor. And so he, your expert characterizes Gonzalez choice is inappropriate. Does that amount to anything more than a normal garden variety negligence or malpractice? How does that arise to deliberate indifference if two doctors at a different view and one thought before she was going to administer the drug, which had its own serious risks, she wanted an additional test. It was inappropriate. Let's assume it was obviously a mistake. Let's assume. But how does that constitute deliberate indifference? There are cases on that issue divide in two directions in cases for medication or treatment has been prescribed by one doctor and countermanded by a doctor in the facility. The courts have looked to the question of whether the doctor in the facility exercised some kind of independent mental judgment. Now, they talk about cases of Bismarck versus Walter versus Evans in both of those cases. The doctor's examination prior to countermanding the previously prescribed or normally ignoring a prescribed order constitutes deliberate indifference. In this case, asked Dr. Gonzalez whether she had reviewed the medical records or asked any questions about him. She said, No, we didn't discuss the medical records. And so her order countermanding the potassium was totally conclusory and it wasn't based on any substantive medical. Let me examine one follow up if I could. Would it be relevant in the next sort of calculus that your client was stable at that time that he doesn't really go downhill until substantially later in time. That is to say, when the doctor made this decision, not to immediately administer the drug, but rather to wait until the testing wasn't Mr. Ireland stable at that point. Your Honor, to the withdrawal patient will be stable for about 48 hours. And in fact, Mr. Ireland started showing signs of withdrawal right on schedule about 48 hours after his last drink. No, but I mean, at the point in time when Gonzalez makes the determination that she makes. Whether it's a counterman or I'm going to put it on hold until I have the test taken, we can debate how to characterize it, but what's his condition stable at that point. And was that conveyed by the nurses in the medical unit to the physician. Every time he does. I'm sorry. He does say that he feels like he's fine. I think he makes a couple of comments like that before he starts showing since late on Sunday night of withdrawal, which is to be anticipated. He is under observation for withdrawal and Dr. Gonzalez would have known that he was The first likelihood would have been the next morning and and yet she and this is another issue. Goes to sleep. She sleeps through four Phone calls. She's got Her email is full and she knows that she has a patient. She just reviewed. She just received a call on him. The day before that was at risk of withdrawal. So it wouldn't have been expected that he would have been immediately covering but the fact that he had already missed two doses and missed a third by her orders. Created a severe risk that would have known of Thank you. You've answered my question. Mr. Mr. Cook. We've let you go over. So you have five minutes remaining for rebuttal. Thank you. Mr. Bronco you have 10 minutes I think I'm scheduled to go first judge. Oh, you are. Okay. I'm sorry, Mr. To me. Okay, five minutes for you. I'll answer Judge Marcus's question. Yes, to all. It is important that he was stable and he certainly was, according to the record, he was monitored. He was on a withdrawal protocol. And there was for two days. No strange finding The crux of the matter regarding Dr. Gonzalez is she was being a competent physician. She wanted to do testing because her concern was that having too much potassium is far more dangerous than having too little The, but there's a second point at which The issues change. And that is a 320 in the morning, two days into his incarceration. He did his detention. He changed. He started screaming and yelling. He had a dust up with his cellmate and he had a dust up with the Even her understanding that his condition was changing. The only reason to call a physician was to see if the withdrawal protocol should be stepped up to where it provides medication and not just assessment. And whether he got valium at that time wouldn't have changed the doggone thing nurse Bracey got into the first cell, but he was Mr. Ireland was busting and fighting and one of the corrections officers picked her up and moved her outside. He was still yelling on his way to the second cell and the third cell and was only when they put them down that His condition changed. He was unresponsive. They immediately started CPR. They got the CEOs to call us It's like clockwork. The way this one ran. Now, unfortunately, the man died. When actually, did they try to call Dr. Gonzalez who didn't answer the phone four times in the middle of the night. Well, connection with this sequence that you've just described as he was in the cell with nurse Bracey in the first cell. He was still awake, he was still active. And of course, when Dr. Gonzalez nurse Gracie. Call the doctor. What was she seeking nurse Bracey didn't It was nurse either nurse evening or went to call Dr. Gonzalez. When and why, in relationship to these events in the middle of the night when he started fussing with his cellmate and the corrections officers when it Is this Sunday night and about what time 320 am Is when it began. Nurse Bracey what I'm talking about when the there's Marcus's questions when when the nurse makes these four calls to the doctor was between three 320 and four o'clock. The reason for the issue on site or she's at her home. Dr. Gonzalez was at home. Now there is was She was the duty physician required to respond to any problem. With medical care at that time. Right. She was the one on there, but she she was the on call physician. She was the one on call, but others can be called in work. There's always an availability to call one of the nurse practitioners that work in the jail, or in this instance they called Dr. Delgado, who's not doesn't work in the jail he works up in Okaloosa at the time. And he gave orders for the value which is what they were after. That's was the only reason for the phone call. Because the nurses can't prescribe or give medication without a doctor. Agreed to it. Correct. Correct. Especially not a scheduled narcotic. If I understand, I'm sorry if I understood the argument of Mr. Cook. It was the deliberate indifference is established here, not simply because the doctor countermanded or held in abeyance. The hospital's diagnosis and prescription. But the doctors subjectively knew of the risks. And the circumstances changed. And the doctor would have been told that if she had earned to answer the phone when the nurse call. But by failing to answer the phone on four successive occasions. The nurses had no ability to take the one step they could have taken, which was to administer the potassium, as he was sustaining this withdrawal problem. Is that enough to state a claim for deliberate indifference, perhaps state but not prove. Why not? Because the in this particularly in this instance, it wasn't the potassium that he needed. It wasn't going to have immediate effect. And he wasn't in a critical state when they attempted to call Dr. Gonzalez or talk to Dr. Delgado. He was not. He was yelling and screaming. The only thing they were calling for was to up the ante and the withdrawal protocol to give him value. They weren't thinking to send him to the hospital. He didn't need to go to the hospital at that time until he collapsed, which was later. Once he did, then the process went ahead. When did he collapse? What was the timeframe for the collapse? I'm going to say it's 420. I don't know the record, Mr. I'm sorry. It's about it's about that time. And I showed up and took him while the nurses were doing CPR. He was there was about an hour of time where he was OK and no one thought he needed to go to the hospital. They thought he needed to get value, which would have worked in a few hours. I take it the there was an autopsy here. What was the cause of death? It was. The effects of alcohol withdrawal. Is there a cardiac arrest? Correct. Correct. Cardiac arrest with the sub of the effects of withdrawal. And what was the reason of the cardiac arrest? Well, according to the medical examiner and Mr. Cook's expert, no one can distinguish his claim from his comorbid conditions, which were stunningly enlarged liver. I'm sorry. Was there any was there any expert evidence about whether Valium, which was not administered in the middle of the night because the nurses couldn't get through to the doctor that value played any role in causing death? No, there was not. There was no evidence on that at all. No, sir. OK, thanks. Did he have any cardiac problems that are documented in this record before this event? No, he wasn't. He wasn't seen by physicians. What? He wasn't one that sought out physicians. Right. And what about this withdrawal program withdrawal protocol that you say the jail had? Is that a written document in the record? The jail's withdrawal protocol or observation or whatever? It is. It's called the vernacular as cows. C.O.W.S. And I believe it says it that calls it that at the top of the record. And what it is, is you have a record site. Sure. I can. You can you can look for it while Mr. Ranko's arguing. I'm sorry. That'll be a deal. Thank you. The what happens is there's a couple of columns and there are observations to be made, vital signs to be caught and it's scored. There's each everything gets a number. And when the total is between is over a certain number, then they're the nursing staff is to contact the physician or whatever practitioner nurse practitioner physician assistant for orders to see if we're going to go from just observation to observation with value or at a van is sometimes depends on the jail sometimes. But that's how it works. It's a sheet of paper. That's the protocol. And was the sheet of paper that had been filled out since his admission to the jail in the record here. Yes. Okay. So, did he ever go before the. I guess 320 on Sunday. If he ever chart out in numerical fashion to require value. No, ma'am. And did he come close to it or any charting out anywhere near until that started. No, man. And then what, what happened, they go to the chart and enter a number that required them to call for the volume, or let me ask another way was the next step to order value, value or out of van. Delgado did. There was nurses realized that the way he was behaving required them to call the doctor to see if he could, he should have the second part of the protocol. It was behavior, they didn't, I don't believe they scored him at that time. They'd have a hard time doing. But then the behavior, cause them to call Dr. Delgado and and he answered the phone and did he prescribe the value. Yes, it was, but it wasn't given because by that time, Mr Ireland was going out ems. You know what time Dr Delgado was Paul. It's about four o'clock I'll find that site in the record as well. Right. Mr Bronco will let you still have your 10 minutes for rebuttal. Thank you. Thank you, Your Honor. Yes. Thank you. May it please the court. Summer Branko here on behalf of the defendant. Sheriff actually defendant I say a police sheriff, as well as all of the corrections officers are seven of them that are named. You know there's no doubt that this case resulted in a tragic death of Mr Ireland, which you know none of us here would contest that it was a tragic ending to this situation. However, the law is clear that in terms of the corrections officers involvement with Mr Ireland in the medical unit that they are not to be judged with 2020 hindsight, which is exactly what the appellant does in this case, both on the appeal as well as below. And it's important based on the law and not only are these individual deputies not to be judged with 2020 hindsight they're also to be judged individually based on what each of them knew or didn't know, and whether or not what they did in regard to Mr Ireland whether or not that was reasonable under the law, and I'm sure your, your honors are are well familiar with the standard in that regard. And the fact that in the last six years I guess it's been the Kingsley case changed the standard to an objective standard in a jail setting where it was a pre childhood teeny such as Mr Ireland. And, and it's very similar to the Graham v Connor type analysis. And so what, what I just want to make sure that your honors are focusing on and looking at this case from a de novo perspective as is set forth in the briefs, you know when deputy when he first went in to Mr Ireland so he was alone, and he, you know, he, he had had some dealings with with Mr Ireland in the past but not, not much and he is not a medical medically trained corrections officer, none of the corrections officers are medically The record is clear and it's undisputed that when deputy Schwartz and trooper went to Mr Ireland cell upstairs it was cell number 20. He was accompanied by a nurse Heavener was also a named party in this case, such that you know this is not a kind of was housed in the medical unit. The, the nurses were there in the unit, and the corrections officers I know the plaintiff. The appellant takes much issue with this but the corrections officers had their role there and their role was essentially security and enforcing the rules, where the medical people were dealing with the medical part of it. And while the corrections officers did receive training. Quite a bit of training and use and use of force and that sort of thing. The record is also clear and I'd refer to documentary 107 with their complete training histories that they receive training not just in use of force, but in dealing with the mentally and that sort of thing. And so anyway that they work in conjunction with the, with the medical staff, and in regard to the uses of forced deputy Schwartz and trooper was confronted with a gentleman Mr Ireland who was over 300 pounds he was a very large man. And unfortunately when deputy Schwartz and trooper attempt attempted to take Mr Ireland cellmates belongings out of the cell. Mr Ireland took an aggressive stance toward the deputy which was witnessed by nurse Heavener who was there at the door. And that is what prompted deputy Schwartz and trooper to utilize his taser, which took Mr Ireland down to the ground, however it is undisputed, and I would refer your honors to the record it documentary 99 where the plaintiff responded to the factual. The facts in this case and it was undisputed that Mr Ireland was able to after being tased able to get to his knees and remove one of the probes of the taser from himself. Now that is a concern to any corrections officer, because that means clearly he's not complying with deputy Schwartz and troopers commands and still very much poses a risk, and as a safety concern to deputy Schwartz and trooper, he calls for backup. And the record shows that other deputies, not all of them at once but other deputies first responded. Deputy Schwartz and Wiles, and also Slusinski showed up and did their best to assist in trying to get this 322 pound man under control. A lot of the record. The plan if I know argues in his response that or the appellant I should say argues that you know well well Mr Ireland was in the throes of a seizure and so you know that these deputies should have known that he was suffering a seizure. And I would show you to the court that the record is clear that there was no seizure activity. Additionally, it is undisputed, again I'd refer to documentary 99, the plaintiff admits the appellant admits that Ireland was resisting efforts he was not having a seizure, but he was resisting, he was not complying, he was kicking his legs, he was keeping his arms under him. And it started with the deputies just trying to physically gain control of him, arms behind their back, arms behind his back. That wasn't working very well, they ended up having to use it. Help me with this, why couldn't they just exit the cell and leave him in there. Well the problem with that is, there's a couple things the problem with that, Your Honor. Number one, they're not judged by what they could have done but what they did do. Number two, the whole argument by the plaintiff or the appellant is that Mr. Ireland needed medical care before medical could even go see Mr Ireland, he needed to be under control and clearly he was not under control. The Kingsley case, Your Honor, demonstrates that the United States Supreme Court understands as I'm sure you all do as well that running a jail is a particularly difficult undertaking. And they're not to be, you know, second guess in terms of how the officers enforce the rules. This particular incident happened at 320 in the morning that's when it began when all these inmates are trying to sleep. And, you know, this is unlike something that maybe would have happened at noon. You know they can't just let Mr. Ireland yelling scream and cause you know everybody to wake up and cause a problem in the unit they're trying to quell the disturbance and trying to quiet, quiet everybody down unfortunately Mr Ireland reacted as he did. And the other issue with Deputy Schwartz and Truber just closing the door. He had a concern about leaving the cellmate Mr Weiser's belongings in the cell from a security standpoint in terms of safety, what Mr. Weiser might have done if the items hadn't been removed at that time. Again, we all know sitting here today, how things evolved Deputy Schwartz and Trouber of course didn't have the luxury of know how things evolved, or frankly devolved, and he should not be you can tell the brain that the medical examiner put anything in there about seizure or no seizure, or does any person say it was a seizure because you can you can tell afterwards, whether there has or has not been a seizure. Yes, Your Honor. Actually, Dr. Utley who was the medical examiner testified in this case that, based on her review, there was no evidence of seizure seizure activity of Mr. Ireland while he was at jail. I think that came up in regard to a cellmate, not a cellmate another inmate that was in another cell that claim she heard somebody say he may be having a seizure and I think that's where that comes from. That was pure speculation on the part of that inmate. More importantly, to answer your question, Paul, there was there was no medical evidence to support that claim. In this case, can I ask you a slightly different question. When I looked at the district court order. The district judge makes some reference but doesn't really do a qualified immunity analysis. Is this a case where we ought to be engaging in a qualified immunity analysis, the two step process. When he didn't, it just doesn't take it up. There was a violation of the Constitution insofar as there was excessive force and the law was clearly established at the time to put the offices on fair notice that kind of analysis is not made in this case by the trial court. Are we to engage in it or simply do the kind of analysis the trial court did in your view. Thank you for that question, Your Honor. My response to that would be, number one, I don't think you need to reach the qualified immunity analysis because based on what the officers knew at the time, and based on the Kingsley factors, they did not use excessive force, based on what they knew it was reasonable what they did each and every one of them separately, based on what they knew, but I would also, as I did in my briefs, submit to you that to the extent your honors were to either believe that there, there is a dispute in the material facts about that issue, or that even if you didn't want to reach that issue, I would then submit to you that the evidence supports that these corrections officers were entitled to qualified immunity, based on the fact that no reasonable officer in each of their positions, based on what I would submit to you, kind of, in every way shape or form whether your honors felt that you needed to reach the qualified immunity analysis, whether you did or not, I think the end is the same that the deputies and the sheriff are entitled to summary judgment. I see I'm over time. So of course I would rest on the briefs, unless your honors had any additional questions for me. Mr to me do you have some of the record sites. Yes, ma'am. Okay. The cows is 83 dash two pages, eight, nine and 1717 includes a standing order for it. You asked about the call to Dr Delgado, there isn't a specific note saying exactly when the calls were made. Nurse even are in the same exhibit wrote a narrative that's kind of long after the fact sort of thing at 13 and 14. But it's clear in the record that Dr Delgado was reached before. EMS was called EMS was called. Where is that record site. It's 83 dash two, that would be the last one page 14. Okay. All right. Perfect. Thank you. I didn't have it. That's okay. Thank you very much for looking. Thank you. Mr cook you have five minutes remaining. You have to mute your unmute you. Thank you. Thank you. Yes. First of all, I think it's important to know that the events, indicating delirium remnants and alcohol withdrawal began to occur at 11 o'clock. When he said Mr Ireland started shouting as officers focus weird obnoxious statements out onto the wing. The issues regarding is the use of force started with his telling officers. I need my medication, I'm going through the teams, obviously he knew something about DTS. And so he told the officers, he was going through DTS. The use of force was conducted at a time when the neighbors around him said that he responded to the orders by saying I can't or I'm trying. I can't I've just been tased his demeanor at the outset was not hostile. The, the, it took about. It took about 10 minutes to restrain him completely with his hands cuffed behind his back and straps around his body. At that point, he was dragged out onto the catwalk. And according to his neighbor both. He was at that point still and and motionless and silent. So, when nurse Gracie gets up there he's already unresponsive and the rec show that he's unresponsive. Now he comes back when she shines light in his eyes and you can see the light, actually in the video and in the stills, and there's a bad word and although Mr. Ireland is completely restrained with his hands behind his back. She is actually physically 10 from the room, and she doesn't have, and no one else has another chance to take his vitals, but that's all she can do is take his vitals as an LPN work supervision. She can't do anything else and neither can Mr Havener. So at the point that he's completely restrained, if not at 11 o'clock if not at 320 at that point at 336, they should have called 911, and he ended up being in the jail for another hour. After he was completely restrained. The fact that the use of force may seem appropriate. Basically, because we're ignoring all of the statements made by the inmates in nearby cells they hear Mr. Ireland gasping for breath. The officers themselves say that he was flopping like a fish. Now the medical examiner doesn't actually say that he wasn't suffering a seizure. She said that a seizure is reflected in her report. However, she said he did have he was showing signs of delirium tremens, and she said signs of delirium tremens would look like a seizure with the thrashing of the arms and legs with paranoia, and some of the other things including the autonomic instability which the medical examiner and our experts caused by failure to provide the potassium that resulted in arrhythmia and tachycardia is notably responsible for oxygen starvation. The medical examiner said the Gary of his brain were flattened which is typically and she agreed that that was a typical sign of oxygen starvation, and not getting oxygen to his organs. He suffered noxious brain damage, and all of this is based on autonomic instability lack of oxygen, and a failure to get him medical attention on time when the jail could not provide it. There are a number of cases, relating to the need for training, like this, and fun versus Harris in light of the duties assigned to specific officers or employees, the need for more difficult or different training is obvious. And, and so basically I think that the sense of debris should be that this case should be returned for trial for jury to weigh these issues. Thank you, Mr cook. Thank you, Mr Jimmy and thank you, Mr Bronco we thank you for your arguments and we'll take the matter under advisement, thank you very much. Have a good day. Thank you, Your Honor.